**GOOCHER v. STATE.**

5 Div. 126.

Supreme Court of Alabama.

June 29, 1933.

Rehearing Denied Oct. 12, 1933.

Holley & Milner, of Wetumpka, for appellant.

Thos. E. Knight, Jr., Atty. Gen., for the State.

THOMAS, Justice.

The defendant was indicted and convicted of murder in the first degree, and his punishment fixed by the jury at life imprisonment.

The witnesses Smith and Cobb testified to finding the body of deceased, on the ground, with a whisky bottle near by; that he was shot several times; that there were signs of bullets having struck the ground at or near the body; and the sheriff was notified.

The witness Golden testified that he was the sheriff; went to the body, found it at the point indicated, clad, as he indicated, in a pair of light trousers, black slippers and a shirt; that. the body showed a number of shots had pierced it; that he found some .45 caliber bullets under or near the body, and he delivered the corpse to the undertaker. The wife of deceased there identified the husband's remains, and Dr. Sewell examined the same, describing the nature and character of the wound that produced his death.

The witness Price testified that she and another met the defendant and one Preston at a café; that they proceeded by witness' house and thence to a place where the four went in bathing; that, when she came out and was dressed, defendant was with her quite a while, and in the course of their conversation he mentioned the deceased, saying that, if deceased did not pay up, he was going to murder him. The other woman did not hear the threats made before she and her companion came from the water, corroborated in other respects by Miss Price.

■ Witness Clark testified of defendant's recent threats against deceased for the reasons specifically stated; detailed the time, place, persons present, gave the words spoken, threats made, and the reason therefor. The reasons were, in substance, that Fletcher had been left out of a job (a robbery) arranged and agreed upon by defendant and others; that defendant made the threat that, if he talked too much, they would kill him, saying: "We are going to kill him (meaning Fletcher), if he does not quit talking, we are going to put him on the spot"; that defendant said he "was afraid that he (Fletcher) was going to talk too much, that he had been seeing him around police headquarters * * * that he had had some trouble with him and that he was going to put him on the spot if Fletcher did not come across"; that "he was afraid Fletcher was going to talk about things he knew on Goocher, such things as hold up business and things like that." The witness stated at a later date Fletcher was pointed out to him, and that Goocher then said "he was going to kill that man, that they were going to put him on the spot, and called him a s—— of a b—— and bastard"; that witness heard defendant make such threats against Fletcher in the presence of witness, Preston, and Russell, when they were "talking about the (other) plans." The witness finally stated the last threat as follows:

"The Court: Use the words or language, substantially what Goocher used. A. 'We have planned this job, and left a man out that we are afraid will talk too much, and we will stand pat, we are sure we will stand pat, and if this man Fletcher tries to give us any trouble, we will kill him, we will put him on the spot;' that is as near as I can quote

the words that were used on that particular trip; that is not all the conversation but that is the threat;" and that the man left out of such other job was Fletcher.

Whereupon the solicitor tried to locate that other job, and the court declined to allow the solicitor's question: "Did Fletcher take part in the Canterberry robbery?" Witness stated that he saw the defendant for "the last time * * * after that conversation out there on the river bank," and has not "seen him since then until today," which was Saturday, August 13th. The homicide was a few days thereafter on the night of August 16th. We find no error committed in the introduction of the evidence of this witness.

The witness Lockhart testified that he lived near where the body was found; that between 9 and 9:30 o'clock on the night of the killing a man came to his house making inquiry of one Cain; was told to proceed to Mr. Cobb's home and inquire; that witness later identified the man as defendant, who was at witness' house on the night of the homicide and in that immediate vicinity at the time the shots were heard. His (Lockhart's) version was:

"The car stopped and a man got out and walked up apparently going to come up on the steps, and my wife asked him who he wanted to see and he asked her if she knew where Mr. Cain lives. And she asked me if I knew where Mr. Cain lives and I said I didn't that I never heard of him. She asked the man if he knew on whose place he lived and he said I don't believe I do. And my wife asked him if he lived on Mr. Henry Cobb's place and he said I think that is the place. She said that if he would go up the road and if he lived on Mr. Cobb's place that he could tell him if he lived in this neighborhood. Then he asked me how to get to Mr. Cobb's place. I told him a colored family lived in the first house, the next house a party lived in, the next house was vacant and the next house was Mr. Henry Cobb's. He said 'all right' and walked out and got in the car and said to the driver, 'We will have to go up this road.' The car hadn't been left my house but something like three minutes when the shooting started. The automobile was headed toward Prattmont. That is the direction of where the body was found the next morning and the direction in which I heard the shots. To my best knowledge, the man who was doing the talking is this defendant, Otis Goocher. The moon was shining as bright as day light and you could see the man standing right in front of the window. I was looking right out the window in his face, and his talk was the biggest part of his identification, was the way he talked. * * * He talked some two or three minutes. My wife told him the way to go. I saw him go to the car, get in it and he went

kinder east, in the direction the body was found, and *it couldn't have been over three minutes from the time the car pulled out until the first shots. There was a car after the shooting was over came back towards Millbrook, a few minutes afterwards, came back by my place."* (Italics supplied.)

And on cross-examination witness stated: *"After this man got in the car and had been gone about three minutes, I heard some shots fired.* I had never undressed. My wife was not in the bed with me, she had never even pulled her clothes off, she was attempting to undress when the man came up. As far as I know my mother-in-law was in the little room across the hall. In my best judgment the defendant here is the man who came up there. The man was dressed in his shirt sleeves, had on a pair of grey pants, and had on a white or blue shirt. He didn't have on a hat. I am sure that he didn't have on a hat. Didn't have on a coat, the man that was out there was in his shirt sleeves and had on no hat. I saw the defendant some three or four, maybe five days after that at Police Headquarters in Montgomery." (Italics supplied.)

A predicate was laid for the contradiction or impeachment of this witness as to how the man was dressed, etc., and on declarations of the witness showing motives or bias, and those of witness' wife, who was a state witness.

Witness R. M. Rawlinson testified: "I recall the day the body of Fountaine Fletcher was found over near Mr. Cobb's. *I heard several gun shots the night before.* I was in my room lying on the bed. The clock had struck nine, just a minute or two after nine. There was no one in the room with me. Mrs. Rawlinson was in the dining room fussing with the boys. I heard several shots, then an intermission, and then 2, 3 or 4 more shots. I didn't see anything before I heard the shots. *After I heard these shots almost immediately I saw the reflection of a car shining in the room. I couldn't say that I heard the car,* just saw the reflection of the lights. When it passed *it was coming on down the road from where the shooting took place.* You could see the reflection from the road just below. Where this body was found the road runs back from my house west coming back toward my house. The road makes a turn from running east and goes north. When passing north, *Mr. Lockhart's house is the nearest house* it passes and after that it goes east again." (Italics supplied.)

Witness R. M. Rawlinson, Jr., testified that he heard five shots and "quit a half minute and then there were three"; that he "saw two cars come up the road * * * a good ways apart. The first car * * * passed our house * * * turned around in front of our house and went back toward Millbrook. It came from the west in the direction of Mr. Lockhart's house. * * * The car went down the road and turned around somewhere, came back and drove into the gate and turned around and went back east toward Millbrook. * * * I noticed it because I was looking at the other car when it came and turned around. * * * The car that went in our driveway was a Model T Ford. I couldn't tell what kind of car it was that turned around in front of Dr. Thigpen's road and went back in the direction of the shooting."

Mr. Curtis investigated the homicide, knew the deceased, arrested the defendant, and found an automatic pistol, .38, in his room. He testified: "I asked him where he was the night of the 17th, which was one week from the time I was there. Witness was asked the following question: 'Now when you asked him that question, did you observe his demeanor, what was his appearance?' (Defendant objected to the question on the ground that it called for a conclusion of the witness. The Court overruled the objection, to which action of the Court the defendant then and there duly and legally excepted.) When I first told him to get his clothes on and get ready, I was going to take him to the office, and I noticed he was very nervous. * * * I carried him to Police Headquarters. Mr. and Mrs. John Lockhart were there. I didn't know they were there but they were in there when I brought Goocher in. * * * After Mrs. Lockhart came in I asked her to have a seat. Witness was asked the following question: 'When she walked in and you asked her to have a seat what did he do?' A. 'He reached up here (indicating) and covered his face—the side of his face, and I made him remove that hand, so that she could have a view. I asked him if he had corns in that hand, and he said I have got no corns.' * * * While Goocher was sitting at the table and Mrs. Lockhart came in, he put his hands up to his face. Mrs. Lockhart stayed about a couple of minutes. She came in at my invitation."

The next witness, Burl Clark, told of the conversation he had with the defendant, Preston, and Russell, in which the threats of defendant against deceased were made, and was asked by the state:

" 'Tell the conversation, if you said anything to him, and what he said there, what Goocher said, go on with the conversation.'

"The defendant objected to the question so far as it called for anything exclusive of threats against deceased, and thereupon the Court stated to the witness: 'Part of the conversation, what Goocher said to you and what you said to Goocher, part of entire conversation.' To this action of the court, the defendant then and there duly and legally excepted. The witness there-

upon answered as follows: 'Well, I asked him why, asked Goocher why they had not pulled the job, if they had been out there, and Goocher said well they got cold feet, they could not get a man to drive the car, without getting cold feet, or something would happen to prevent them from pulling the job after they got on the spot; that they had left Fletcher out, because they were afraid of him; he said he would stand behind us; that he had planned up an alibi for that night; that he was going to the Marathon dance place, where he would be seen by the officers and people out there, because he would be suspected of robbery, and after he got his alibi established, if he was asked about it, he would be all right, and he would protect us fellows, he would stand behind us, and that we had planned this job now and left Fletcher out, that we were afraid of him, afraid he had been talking and afraid he would talk more and give trouble, and that if he did, we will kill him, we are going to put him on the spot. I did not see Goocher after I left him that Saturday Afternoon.'"

In this action there was no error—it was relevant to show motive on the part of the defendant to kill deceased and immediately preceded the homicide.

Mrs. Lockhart testified of the man making inquiry for Mr. Cain, gave him direction to Mr. Cobb's place: "He walked off, I looked to see if I had seen him before I thought I probably might have known him. I heard his voice clearly. There was something peculiar about it. He talked as if his tongue rolled, had a southern brogue, or New Orleans brogue I call it. He came to my house in a car. After he got on the front seat he kinder turned and spoke to some one on the back seat and said we will have to go up the Hill to Henry Cobb's place. That is all I heard except the car going off. Later on I heard 9 shots. After that I heard a car coming back by my house. I went to Montgomery that day. The next time I saw Otis Goocher was in the Police Station. I was in position to see him and hear him talk. I knew right then it was him and I told them that I would be more positive if I could hear him talk. I heard him talk and am positive that the man at the police headquarters, Otis Goocher, and the man on trial here today is the same man who was at my house. It wasn't very long after he left my home until I heard shots. I would say from three to five minutes. * * * He put his hand up over his mouth and Mr. Curtis took his hand down and I got a good look at his face and heard him talk. * * * This man that came to my house either had on a light blue or a light green shirt and his sleeves were rolled up. He had on a dark belt with a bright buckle and dark looking pants and his shirt was either light blue or light green. I didn't see any hat and he didn't have on a coat." The witness denied statements alleged to have been made by her when being warned as to identifying defendant, and said: "Well, darn that man. What I want is to get John (referring to her husband) a job"; admitted that some one had paid "our gasoline bill"; denied she had been given $15, or that her husband had said they would get Clark a pardon to confess.

The testimony of Holcombe and Turner showed that deceased was drinking on the afternoon of his death; and Holcombe gave deceased "a hair cut and shave."

The testimony of Golden was to the effect that the body showed a "fresh hair cut and shave."

The witness Lockhart was asked whether he made the statement attributed to him as being made to Moore, to the effect that he was going to work for the city; denied that he made such statement, admitted that he said he would "wind the bill up in a few days, provided they would come to the agreement" as to the light bill and Frigidaire; did not tell Hunter he would go on the police force in a few days. Witness was allowed to testify, over objection of defendant, that he voluntarily resigned from the police force. In this there was no error; it was by way of rebuttal to the foregoing cross-examination, and tended to shed light on his bias, interest, and motive in looking up evidence and in which his testimony was to be considered.

Mr. Cobb testified that Lockhart told him of the man coming to his house on the night before the body was found and that he directed him to witness' house; that witness asked Lockhart if he knew "who he was, and he said: No, I do not, it was dark"; that the latter did not say anything about the man having a peculiar voice; stated to witness that he was "getting up evidence."

Moore's testimony was to the effect that Lockhart said he was going to Montgomery to see about getting a job on the police force.

Defendant's evidence tended to establish an alibi by the testimony of witnesses Haynes and Cargill as to the date and the time of the homicide. There was no error in not permitting the witness to testify how long the police authorities kept his servant in jail after the arrest of the defendant. The jury were allowed to retire during the discussion of counsel as to this evidence; the defendant's counsel saying: "We propose to ask her, after she was in jail, she was taken from the jail by Chancellor and Dennison, and carried out from the jail to the outskirts of Montgomery, and there they attempted to make her tell something different"; that the purpose of the examination proposed was to show the extent "the

police department has been going in Montgomery to force witnesses to make statements." It is sufficient to say that the witness was not affected in her testimony, and no confession or change of evidence was alleged or shown to have been made. This ruling is not within the decision of a confession, the subject of discussion in Burns v. State, 226 Ala. 117, 145 So. 436. It is subject to different rules of evidence.

The witness Cargill testified: "I saw it in the papers and heard about it. I was at home on the night of August 17th. Mr. and Mrs. Goocher were at home that night. I went in Mr. Goocher's room and used the telephone about 7:30 or 8:00 o'clock, something like that. I used the telephone in his room and remained there the balance of the evening until about 11 o'clock playing Casino—cards —when they left to take the maid home, a negro girl. Both Mr. and Mrs. Goocher were in the game that night. The girl was ironing in an adjoining room. I was there from the time I used the telephone in that room an insurance agent came in there to see me until about 11 o'clock, continually. Mr. Hood, about 9 o'clock, but didn't come in the room. I talked with Mr. Hood there."

Thus the question of alibi was clearly presented by Cargill's statement; that of Haynes, the defendant, and other of his witnesses.

Mrs. Helton's testimony was in the nature of contradiction of Mrs. Lockhart's as to the manner in which the man making the inquiry at the Lockhart's house on the night of the homicide was dressed; that she saw only one car; that it "turned around" and went "back towards Montgomery"; that it did not stop "from the time the man got in it at the house (Lockhart's) until it went around the hill up there at Mr. Cobb's"; that the last place she saw the car was "between where it was said the body was found and the old house in there"; that she would not be willing to swear that the man on the porch and in the car was the defendant; "could not swear it was him from the way he talked"; she contradicted Mrs. Lockhart on the predicate laid as to the latter's reply: "What I want is for John to get a job." The witness Helton said she was watching the car and "heard shots go pow, pow, pow. I heard three and then I heard it go pow, pow, pow again and I said 'Listen Mr. Helton somebody is killing somebody,' and he said that was a backfire, and I said, 'Well, they are going on up the hill now, anyhow, and never stopped.' When I heard the pow, pow, pow, they had not gotten to the place where the killing was. I can't say whether it was right at the spot or not. * * * *I was looking at the car at the time I heard the shots. The men in that car were close to the point where the body was found when I heard the shots. The man that came to the house had on a straw hat with a black* band. It was a flop down hat. It covered his face some, a broad brimmed hat. He had on a gray coat. I never noticed his belt buckle or shoes. I don't think he had on a tie." (Italics supplied.) This witness further testified: "I can't say that there is any similarity in the voice of the man I heard talk yesterday and the man who was there that night. There was something peculiar about the voice of the man who was there that night, he talked kind of funny. When he started off I said to my daughter, he talks like a yellow man, and she said he had a New Orleans brogue. * * * There was something peculiar in his voice that distinguished him from other people I have heard talk. Enough for my daughter to remark that it was a New Orleans brogue. He did not talk like we do of course. When my daughter got back from Montgomery she told me she recognized him."

The witness W. H. Helton impeached his daughter and her husband as to conversations denied by them to have taken place—as tending to show their interest in the case. Witness later testified of the two cars: "At the time I heard the shots, this last car I speak about was somewhere about where it entered into the road that passes our house and goes toward Henry Cobb's. * * * This car that stood in front of our house at the time I heard the shots fired, was somewhere about the top of this hill, the best I could determine from the light. After this car passed, there was another car came down this road going south or east, came on down this road and went on around and out." The Heltons' view was from the back of the house toward the place of the homicide.

The witness Essie Lee Haynes (the colored servant) was recalled by the state, and testified: "I do not know whether Mr. Goocher spent the night of August 17th at home or not. I know he carried me home. I don't know what he did after that. I don't know where he went after that. I saw him leave and go back in the direction of his home, but I don't know where he went. I don't know what time I got back to work the next morning exactly. I was not so early. Mr. Goocher was there when I got back."

The state then showed by Mr. Watson (a policeman): "I know when Mrs. Goocher was released from jail. Immediately after that I went to the home. Essie Lee, this colored girl was there. I heard this girl say to Mrs. Goocher: 'Wouldn't it be better for me to say that I spent the night here with Mr. and Mrs. Goocher on the night of August 17th, than to say I stayed here until 11 o'clock and you all carried me home.'" The Solicitor had just asked the witness if the negro had made this statement, the defendant objected to the question on the ground that it called for a statement not made or shown to have been made in the presence of the defendant, the Court

overruled the objection, and to this action of the Court the defendant then and there duly and legally excepted. The witness replied thereupon that the statement was made by Essie Lee. Continuing the witness testified: "At that time I had just come back from Blakeley, Ga., with Mrs. Goocher. Goocher was in jail at the time."

On cross examination, witness testified: "That was 20 minutes to 2 o'clock on Saturday afternoon. I remember what happened on 20 minutes to two on the day before, and the day before. I remember what happens at 20 minutes to two every day. There are several things I could tell. I am a good policeman."

The witness Haynes was recalled by the state, and on cross-examination testified:

"I know Mr. Chancellor here and Mr. Dennison. They came to 35 Pollard Street and talked to me. They came out there, I don't know what time but they came out there." Witness was asked the following question: "On Sept. 12, about 6 or 7 o'clock, at 35 Pollard Street, did not Mr. Dennison and Mr. Chancellor ask you who was in that house on the night of August 17th, and didn't you tell them, that on that night there wasn't anybody in Mr. Goocher's room except Mr. and Mrs. Goocher and two girls that boarded there and yourself?" To which witness replied: "No sir."

Witness was asked the following question: "And in that same conversation a little later, did you not say 'No, I am mistaken, the girls had moved and there was nobody in the room but Mr. and Mrs. Goocher and myself?'" to which witness replied: "No sir. I did not say that or that in substance."

On re-direct examination, witness testified: "After that they put me in jail, it was after that that they came out there and got me and put me in jail and kept me there a month lacking three days. Those were the men that carried me out to the edge of town there, then carried me back down and put me in jail again."

On re-cross examination, witness testified: "I was there when Mr. Watson was there."

 The witness Chancellor stated he was a city detective; knew the witness Haynes; that on September 12th he and Mr. Dennison went to her home and she stated "to us that on the night of the 17th of August, there wasn't anybody in Goocher's room except Mr. and Mrs. Goocher and two girls that boarded there and herself, and later on in the same conversation, she said no, she was mistaken that the girls had moved and that there wasn't anybody in the room but Mr. and Mrs. Goocher and herself. She said that or that in substance." The witness then testified: " * * * We arrested that girl" and "put her in jail." Defendant sought to

show they had no warrant for her when they put her in jail, and was denied on the state's objection. In excepting, defendant's counsel said he proposed to show the methods used by this officer. The court replied: "You need not make that argument about what you expect to show." The defendant was then declined to ask whether the officer had a warrant for her and if it was not a fact that this officer and Dennison did not carry "her out to the suburbs and attempt to make her make a statement or tell a story that would involve this defendant." The state objected, saying: "You have been over all of that once and the court has ruled on it. She says that she has been in jail and that they did arrest her." The objection being sustained, the defendant duly and legally excepted. The record then recites: "Defendant asked the witness the following question: 'I will ask you if also at the time you had her out there, if you didn't carry her out there and hit her and mistreat her trying to make her make a statement to you?' The State objected, the Court sustained the objection and refused to allow the question, and to this action of the Court the defendant then and there duly and legally excepted." The defendant asked the witness the following questions: "And because she wouldn't, you carried her back and put her in jail again? * * * And didn't you say to her that 'You wont talk, G—— D—— you, we will put you back in jail and let you rot'?" to which objections by the state were sustained and the defendant excepted to each ruling.

The facts were before the jury, that the witness Chancellor, as an officer, was with Dennison, was active in working on the case; that he arrested Haynes, placed her in jail, and she was detained there for about a month; that he sought a statement from her as to the case. This was sufficient on the question of interest, bias, and activity, and in which the testimony of such witness will be considered.

If the purpose of the questions to witness Haynes was for predicate or impeachment of Chancellor, the court should have been so informed. The witness Chancellor admitted his activity and interest as an officer; and Dennison was not a witness. There was no error in the court's rulings on examination of witnesses Haynes or Mr. Chancellor. On cross-examination facts may be adduced to show malice, bias, ill will or interest. Houston Biscuit Co. v. Dial, 135 Ala. 168, 185, 33 So. 268; Riley v. State, 209 Ala. 505, 519, 96 So. 599; and authorities; Ex parte State (Johnson v. State), 199 Ala. 255, 74 So. 366; Shores v. State (Ala. App.) 146 So. 537; [1] 40 Cyc. pages 2663, 2675. We think the interest or activity of that witness was fully shown, and in the light of which the jury

---

[1] 25 Ala. App. 351.

could weigh his evidence. In this view all the Justices concur, except Mr. Justice BROWN, who is of opinion that reversible error was committed by the trial court in sustaining the State's objections to questions sought to be propounded to witness Chancellor.

■ Defendant excepted to a part of the oral charge. The court instructed: "Now you have heard a number of witnesses that testified as to threats. Now as to the probative force of threats, the law says that oft repeated threats have more probative force than an unrepeated threat. You have heard the testimony as to threats—what those threats were. You have evidence before you for the purpose of showing motive in this case. Now the law doesn't require that the State show motive; nor is it necessary in a case of this character for the State to show motive; but the State contends in this instance, that there was a motive for this killing, the motive being that the defendant was afraid of Fletcher, because of what he knew, and because he was drinking, and because he knew too much, and was talking too much; and for that reason he put him out of the way; the State further says that this was an organized band in Montgomery, for the purpose of depredation and violation of the law; that this defendant for his own protection had a motive for killing the deceased Fletcher. But you are the sole judges of that; you must arrive at your verdict from the evidence in the case."

In Beavers v. State, 103 Ala. 36, 38, 15 So. 616, 617, Mr. Justice Head said: " 'So the probative force of the threat would be increased if it was frequently repeated during the whole time intervening between its first utterance and the doing of the criminal act, and the same cause for ill will and hate continued to exist. Then it would be imputed to a malignant spirit and a purpose that may have been vacillating, but at last became fixed and settled.' "

We are not of the opinion, and do not hold, that the instruction given invaded the province of the jury. It was, in effect, that the jury, in determining the weight they should give the threats, might consider the frequency of their repetition and their proximity to the homicide, as shedding light upon the malignant motive and purpose of the defendant, whether it was casual, fixed, and settled, and on which it may be inferred with the other evidence that he acted. Walker v. State, 85 Ala. 7, 4 So. 686, 7 Am. St. Rep. 17.

■ Refused charge 9 is covered by given charge 11. Bones v. State, 117 Ala. 138, 23 So. 138.

Refused charge 14 is misleading, due to the last sentence; is covered in the oral charge and in given charges 15 and 17.

Refused charge 19 has been approved in Brown v. State, 118 Ala. 111, 23 So. 81; Veasey v. State, 20 Ala. App. 478, 103 So. 67. It is covered in given charge 20.

■ Refused charges 25 and 26 are properly refused. These charges are not hypothesized upon a "reasonable theory" or "reasonable probability" of some other person committing the crime other than defendant. Ledlow v. State, 221 Ala. 511, 514, 129 So. 282; Pitman v. State, 148 Ala. 612, 42 So. 993.

We find no reversible error, and the judgment of the circuit court is affirmed.

Affirmed.

ANDERSON, C. J., and GARDNER, BOULDIN, FOSTER, and KNIGHT, JJ., concur.

BROWN, J., dissents as is indicated in the opinion.

